# EXHIBIT 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF TENNESSEE
 2                      NASHVILLE DIVISION

 3   RACHAEL ANNE ELROD, ANDREW         )
     KAUFMAN, and SARAH MARTIN, on      )
 4   behalf of themselves and all       )
     other similarly situated,          )
 5                                      ) No. 3:20-cv-00617
                  Plaintiffs,           )
 6                                      )
     vs.                                ) District Judge Eli
 7                                      ) J. Richardson
     NO TAX 4 NASH, MICHELLE            ) Magistrate Judge
 8   FOREMAN, and JOHN DOES 1-10,       ) Barbara D. Holmes
                                        )
 9                Defendants.           )
     _____)
10                                      )
     BROOKS BRASFIELD, on behalf of     )
11   himself and all others             ) No. 3:20-cv-00618
     similarly situated,                )
12                                      )
                  Plaintiffs,           )
13   vs.                                )
                                        )
14   NO TAX 4 NASH, MICHELLE            )
     FOREMAN, and JOHN DOES 1-10,       )
15                                      )
                  Defendants            )
16   _____)

17
            Zoom Deposition of:
18
            MICHELLE FOREMAN
19
            Taken on behalf of the Plaintiffs
20
            January 29, 2021
21

22
     ------------------------------------------------------------
23              ALPHA REPORTING CORPORATION
                   RHONDA S. NICHOLSON, RPR
24              One Vantage Way, Suite D-115
                 Nashville, Tennessee 37228
25                    (615) 244-4812
                    www.alphareporting.com
```

```
 1   A.      No.
 2   Q.      It's not a 501(c)(4)?  You know what I
 3   mean by these terms?
 4   A.      Yes.  And no.  Or no and yes.
 5   Q.      Yes, you know what I mean and, no, it's
 6   not a 501(c)(4); is that right?
 7   A.      Correct.
 8   Q.      Has NoTax4Nash ever filed any disclosure
 9   or registration paper anywhere?
10   A.      No.
11   Q.      And how is it that you know that?
12   A.      I haven't found anything, and I didn't do
13   anything.
14   Q.      Have you searched to see if members of the
15   movement have filed any registrations or
16   disclosures anywhere?
17   A.      No, I haven't.
18   Q.      Who would file a disclosure or
19   registration paper on behalf of NoTax4Nash?
20   A.      I -- I don't know.
21   Q.      You mentioned that you hadn't done it.
22   Would you be somebody who could do it if you
23   wanted to?
24   A.      Possibly.  I haven't thought about it.
25   Q.      Has NoTax4Nash, as of today,
```

Michelle Foreman - January 29, 2021

92

```
 1   January 29th, 2021, registered as a nonprofit
 2   organization?
 3   A.      No.  It's just a movement of individuals.
 4   No -- not structure that you're referring to.
 5   Q.      Well, you're aware that today on your
 6   website, notax4nash.com, it states that NoTax4Nash
 7   is a nonprofit advocacy organization that
 8   initially began as a grassroots organization?  Are
 9   you aware of that?
10   A.      No.
11   Q.      When was the last time you visited the
12   website notax4nash.com?
13   A.      Last year at some point.  I'm not sure.
14   Q.      And we'll talk a little bit more about the
15   website later.  What is the first date that you
16   recall using the term or hearing the term
17   "NoTax4Nash"?
18   A.      Last summer.
19   Q.      And when last summer would that have been?
20   A.      I'm not exactly sure.  That was a name
21   that someone else had come up with.  And I'm
22   trying to remember who, and I can't right now.
23   But it wasn't me.
24   Q.      And were you physically present when
25   someone came up with the name NoTax4Nash?
```

**Alpha Reporting Corporation**

Case 3:20-cv-00617   Document 39-1   Filed 03/08/21   Page 4 of 11 PageID #: 239

1  So I guess anyone could do whatever they wanted
2  to.
3  Q.    Ms. Foreman, my question was:  How did
4  NoTax4Nash decide to make the automated calls that
5  are at issue in this case?
6  A.    They were presented as an option to us by
7  Heather Sellers.
8  Q.    Okay.  And who is "us"?
9  A.    At the time, because, again, we don't have
10 any kind of governing body, it was me and it was
11 Ms. Moore.  And we had been approached by another
12 citizen asking how they could help or be involved
13 or something to that nature.  I can't remember.
14 Q.    And who was that citizen?
15 A.    I can't remember.
16 Q.    So you remember there was one other
17 citizen involved who had offered to help or be
18 involved, and that person was part of the
19 decision-making about an automated telephone call?
20 A.    No.  No.  I think what -- the way that
21 that had happened -- we were asking for someone to
22 help us with the Facebook page, and so that's how
23 we connected with Heather Sellers.
24        And then anything this had to do with
25 robo calls was specifically between Heather

```
 1   Sellers -- and she conveyed that to me and to
 2   Ms. Moore.  And then the way I understood it is
 3   that her partner, I guess -- well, to us -- we
 4   thought it was her partner.  Mr. Gergley is
 5   actually the one who did the robo calls.
 6   Q.      And do you -- but as you sit here today,
 7   you don't recall who that other citizen that
 8   approached you and Karen Moore was that offered to
 9   help?
10   A.      It wasn't to help with robo calls.  No.
11   Q.      Okay.  Was it to help with the activities
12   of NoTax4Nash?
13   A.      Again, there were people from all over
14   Davidson County that wanted to help.  So, you
15   know, I don't remember names specifically.  If I'm
16   not going to give them to you specifically, it's
17   just because I don't remember them.
18   Q.      Okay.  So just to make sure that it's
19   clear, when -- I asked you who "us" was, about who
20   "us" was when you said Heather Sellers presented
21   to us, and you said Karen Moore, Michelle Foreman
22   and another individual who had offered to help.
23           But now you're saying you don't remember
24   who that individual was?
25   A.      I apologize.  I misunderstood the question
```

1  and misspoke.  The only conversations that
2  happened with Ms. Sellers, to my knowledge, were
3  between me, Ms. Moore, Heather Sellers and Joe
4  Gergley.  To my knowledge, Ms. -- Ms. Sellers and
5  Mr. Gergley did not communicate with anyone else
6  other than me and Ms. Moore.
7  Q.     And could Heather Sellers decide to do
8  things on behalf of NoTax4Nash?
9  A.     Yes.
10 Q.     So Heather Sellers was authorized, from
11 your perspective, to do anything she wanted on
12 behalf of NoTax4Nash?
13 A.     She and Joe Gergley were both on the
14 Facebook page creating content and boosting it,
15 and they did the robo calls on our behalf.  Yes.
16 Q.     And -- but when you say "on our behalf,"
17 to me, it suggests that there is NoTax4Nash and
18 then there's Heather Sellers and Joe Gergley who
19 are your contractors, your vendors; is that right?
20 A.     Well, we didn't have a contract, but they
21 did do the work.  They did the content on the
22 Facebook page, the boosting of the content on the
23 Facebook page, certain content, and then
24 facilitated the robo call.
25 Q.     And NoTax4Nash hired them to do that,

1  right?
2  A.    Well, I mean, I don't want to say that.
3  Because, again, you're talking about a large
4  entity of people, and the agreement specifically
5  was between the individuals that I mentioned to
6  you before.
7  Q.    And so that would be Karen Moore and
8  Michelle Foreman on the one side and Heather
9  Sellers and Joe Gergley on the other side of that
10 agreement?
11 A.    Correct.
12 Q.    And that agreement was to do Facebook
13 advertising and boosting of messages on Facebook
14 and then eventually to do prerecorded calls; is
15 that right?
16 A.    Yes.
17 Q.    And so you and Ms. Moore at least took it
18 upon yourselves to authorize those calls on behalf
19 of NoTax4Nash; is that right?
20 A.    No.  We didn't authorize the calls to the
21 cell phones.
22 Q.    Well, I'm not talking about cell phones.
23 I'm talking about the robo calls that you just
24 said you contracted with Heather Sellers and Joe
25 Gergley to place.  Those -- those calls said they

```
 1   were placed on behalf of NoTax4Nash, right?
 2   A.      I just want to make sure that we're clear
 3   on what I authorized or Ms. Moore authorized
 4   because we were very clear on what we wanted and
 5   what the vendor was going to provide.
 6   Q.      And my question for you is:  The calls
 7   that were placed, whether or not they went to
 8   landlines, robo -- I mean, cell phones, whatever
 9   they went to, they said that they were authorized
10   by NoTax4Nash; is that right?
11   A.      I would have to go back and look or
12   listen.
13   Q.      Well, let me -- at the end of the message,
14   do you recall that it said, Paid for by
15   NoTax4Nash?
16   A.      Yes.
17   Q.      And you and Ms. Moore are the two people
18   who authorized the sending of that message; is
19   that right?
20   A.      Yes.
21   Q.      And you are the two people who authorized
22   it to say, Paid for by NoTax4Nash; is that right?
23   A.      I believe so.
24   Q.      I'm sorry.  I was talking over you.  Did
25   you say, I believe so?
```

```
 1   most -- or to the -- making sure they went to the
 2   right telephone numbers.
 3          And -- and, again, as we may have
 4   discussed before, this is a service that they
 5   provide, and so we relied on their knowledge,
 6   their expertise, their experience, in -- in this
 7   field.
 8   Q.     Does Ms. Moore have any background in robo
 9   calls or knowing about the laws that pertain to
10   robo calls?
11   A.     No.  Not to my knowledge.  Again, you
12   know, this is -- when we paid for the service --
13   and Ms. Sellers explained that this is what Joe
14   does all the time.  He's an expert -- we relied on
15   that expertise.
16   Q.     I want to show you this big spreadsheet
17   that your counsel produced to us.  I have no idea
18   what it's going to look like on your screen.  Can
19   you see basically just a lot of fields of data?
20   Do I need to zoom in?
21   A.     I mean, I -- I see the fields.  I don't
22   see them well.  It's very small.
23   Q.     Okay.  I mean, do you see -- the name of
24   the file is "Lauren Maclean.  Voter Data List
25   2020.  NoTax4Nash.  10.07.21 a.m."
```

```
 1   A.      Yes.
 2   Q.      And I'll represent to you that this is
 3   what was, you know, produced to us after some
 4   back-and-forth about technical issues by
 5   Mr. Preston's law firm.  Would this be the same
 6   spreadsheet that you provided to Heather Sellers
 7   to make the calls in this case?
 8   A.      It looks like.  It was the voter data list
 9   from 2020.
10   Q.      And this is the spreadsheet that you
11   obtained by calling the Davidson County Election
12   Commission at some point in the spring or summer
13   of 2020?
14   A.      Correct.
15   Q.      And, you know, I know you're not a
16   technical expert on all this stuff and really
17   neither am I.  But there's three categories --
18   columns, I should say.  Column AO, AP and AQ.
19           And do those appear to be phone numbers,
20   as far as you can tell?
21   A.      What I can see looks like area codes.
22   Hold on one second.  Let me --
23   Q.      Sure.
24   A.      -- move this.  It looks like.
25   Q.      And so when you provided this list, it's
```